UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

J.C.L.,

Petitioner,

v.

WARDEN, Adelanto ICE Processing Center, et al.,

Respondents.

Case No. 5:26-cv-04889-PD

**ORDER GRANTING EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER, DKT. NO. 3**

Before the Court is the counseled Ex Parte Application for Temporary Restraining Order ("TRO") filed on August 26, 2026 by J.C.L ("Petitioner"), an immigration detainee. Dkt. No. 3. On August 31, 2026, Respondents filed an opposition and Petitioner filed a reply. On September 1, 2026, the Court held a hearing on the TRO. After considering the relevant pleadings and argument of counsel at the hearing, the Court rules as follows.

## I. Background

The Court incorporates by reference, the allegations set forth in the Petition. Dkt. No. 1.

## II. Legal Standard

A temporary restraining order is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). The standard for issuing a temporary restraining order is "substantially identical" to that for issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). Pursuant to Federal Rule of Civil Procedure ("Rule") 65, a court may grant preliminary injunctive relief to prevent "immediate and irreparable injury." Fed. R. Civ. P. 65(b). A party seeking a preliminary injunction must establish that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of the equities tips in his favor; and (4) an injunction is in the public interest. *See Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter*, 555 U.S. at 20).

These elements — referred to as the *Winter* factors — can be balanced on a sliding scale, allowing a preliminary injunction to issue where there are "serious questions going to the merits" and the balance of hardships "tips sharply towards the plaintiff," "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131, 1132–35 (9th Cir. 2011) (concluding that district courts may use a sliding-scale approach but requiring all four *Winter* factors to be met).

## III. Discussion

Petitioner argues he is detained under 8 U.S.C. § 1226(c), which states in pertinent part that "[t]he Attorney General shall take into custody any alien who--(A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title." Under 8 U.S.C. § 1182(a)(2)(A)(i)(I),

"Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of--(I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime . . . is inadmissible." Citing *Latter-Singh v. Holder*, 668 F.3d 1156, 1163 (9th Cir. 2012), Petitioner states that § 1226(c) applies because he has two convictions under California Penal Code § 422, which are categorically considered crimes involving moral turpitude and therefore make him inadmissible under 8 U.S.C. § 1182(a)(2)(A).[1] *See* Petition ¶ 5. The Court agrees. *See Latter-Singh,* 668 F.3d at 1163 (holding that California Penal Code § 422 is categorically a crime involving moral turpitude); *Flores-Vasquez v. Garland*, 80 F.4th 921, 928 (9th Cir. 2023) ("In *Latter-Singh*, we explained that the injury required under § 422—that the victim experience sustained fear from the threat—ensured that the statute criminalized only "conduct which results in substantial harm" and excluded non-turpitudinous conduct such as "emotional outbursts" or "mere angry utterances or ranting soliloquies, however violent.") (quoting *Latter-Singh*, 668 F.3d at 1162).[2]

Petitioner sustained two misdemeanor convictions for two counts of criminal threat under Cal. Penal Code § 422. *See* Dkt. No. 16-1 at 6–2. Therefore, the Court concludes that Petitioner is mandatorily detained under 8 U.S.C. § 1226(c). Having determined Petitioner's detention statute, the Court turns to the merits of his argument that substantive due process requires his immediate release from custody.

---

[1] Petitioner also has a 2019 misdemeanor conviction under California Vehicle Code § 23152(g) for driving under the influence, and a 2024 conviction for vandalism under California Penal Code § 594(a). Petition ¶ 17.

[2] Although Respondents argued in their opposition that Petitioner was subject to 8 U.S.C. § 1226(a), during the hearing, Respondents did not dispute that *Latter-Singh* applies in this case.

**A. Likelihood of Success on the Merits**

The Due Process Clause applies to "persons" within the jurisdiction of the United States. U.S. Const. Amend. XIV. It "protects every one of these persons from deprivation of life, liberty, or property without due process of law." *Mathews v. Diaz*, 426 U.S. 67, 77 (1976). "Persons" includes both citizens and noncitizens. *Zadvydas v. Davis*, 533 U.S. 678, 693–94 (2001) (citation omitted). As such, while Congress has the authority to pass laws governing noncitizens "that would be unacceptable if applied to citizens," *Mathews*, 426 U.S. at 77, 79–80, its latitude to do so in the civil detention realm is not unlimited. At a "bare minimum," noncitizens subject to civil immigration detention—just like people detained civilly and individuals accused but not convicted of a crime—"cannot be subjected to conditions that 'amount to punishment.'" *See Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (quoting *Bell v. Wolfish*, 441 U.S. 520, 535 (1979)).

Such "punitive conditions may be shown (1) where the challenged restrictions are expressly intended to punish, or (2) where the challenged restrictions serve an alternative, non-punitive purpose but are nonetheless 'excessive in relation to the alternative purpose,' or 'are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.' " *Id.* (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004), and *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1484 (9th Cir. 1993)).

"Courts in this circuit have held that immigration detention is excessive in relation to its purpose when the conditions in a detention facility endanger a detainee's life." *Sumano, v. Chestnut, et al.*, No. 1:26-cv-04954-KES-CDB (HC), 2026 WL 2177112 at *4 (E.D. Cal. July 28, 2026) (collecting cases that ordered release of petitioners with medical needs who were particularly vulnerable to COVID-19). These cases "demonstrate that detention may be

excessive in relation to a legitimate purpose if the conditions at a detention facility threaten a detainee's life." *Id.*

Petitioner argues that his detention is excessive in relation to the government's purpose of protecting the community and preventing flight because of his dire medical condition and the inadequate treatment at the Adelanto ICE Processing Center. Petitioner suffered a stroke while in ICE custody on August 16, 2026—roughly three months into his current detention. Thereafter, he was transferred to St. Mary's Hospital. His counsel was denied access to his treating doctors. After three days in the hospital, Petitioner was returned to Adelanto on August 19, 2026, and was told he would not receive therapy. Petitioner has not received therapy even though it is part of his treatment plan from the hospital. Petition ¶ 3. Petitioner's counsel, who is also his qualified representative because the Executive Office for Immigration Review deemed him incompetent to represent himself, declares that she spoke to Petitioner on August 25, 2026. Dkt. No. 1-1 at 10, Jones Decl. ¶ 6. Petitioner told her that he is in severe pain which has been increasing each day, and although he has alerted the guards, he has not received medical care. "He has not been provided a wheelchair or walker, even though he has numbness in his feet and was categorized as a fall risk at the hospital. Due to his stroke, he also is having difficulty eating and drinking and his eye will not close. He also said his teeth continue to cause him pain and he is still awaiting their removal." *Id.*

Petitioner has other serious medical needs, including HIV, severe dental decay, a documented history of blood clots, neurocognitive deficits, anxiety, and depression. Petition ¶ 22. Petitioner's sister filed a declaration and recounting that she visited Petitioner at Adelanto on August 22, 2026: "He told me that he has a severe headache that will not go away. He was wearing an eye patch on his right eye and his left eyesight is very blurry. The left side

of his mouth is drooping still, and he cannot keep food in his mouth. His foot keeps falling asleep and he has trouble with his left hand still." Dkt. No. 1-1 at 7, Romelia Decl. ¶ 3. His sister further declares:

> He was not given a wheelchair or walker and has mobility issues due to his feet falling asleep. I spoke with him today, August 25, 2026 and yesterday and he still has not received any physical therapy of any kind, nor has he received a wheelchair or walker. When he speak[s] his voice sounds bad and his head pain is very intense. I am worried he is showing symptoms of another stroke and is not being taken seriously.

*Id.* ¶ 4.

Petitioner's counsel has provided Petitioner's medical records and a declaration from Celina Macadangdang, MD, a physician licensed to practice medicine in Hawaii and board-certified in Family Medicine. Dr. Macadangdang conducted an objective, independent review of his medical records, including his hospital records related to his stroke, and rendered the following medical opinion. Dkt. No. 1-1 at 12–15. Dr. Macadangdang declares in pertinent part:

> In my professional opinion, [Petitioner] is not receiving adequate medical care. The foreseeable consequences of continued inadequate care are serious and, in several respects, life-threatening:
>
> • Recurrent stroke. Without appropriate secondary-prevention management and follow-up, he remains at risk of another cerebrovascular accident. People living with HIV are at elevated risk for stroke and recurrence, making consistent care especially important (Feinstein et al., American Heart Association, 2019; Phiri et al., International Journal of Stroke, 2026).
>
> • Falls, chronic pain, and lasting disability, without physical therapy.
>
> • Malnutrition, dehydration, aspiration, choking, and aspiration pneumonia — recognized and potentially fatal complications of post-stroke dysphagia — without speech and language pathology therapy (Winstein et al., American Heart

Association/American Stroke Association, 2016; Wilkinson et al., Cochrane Database of Systematic Reviews, 2026).

- Undiagnosed and untreated meningitis, risking severe neurologic injury or death, without the now due lumbar puncture (van de Beek et al., Lancet, 2021).
- Corneal injury and permanent vision loss, without eye lubrication and protection for the eye that cannot close.
- Loss of HIV viral suppression, decline in CD4 count, progression to AIDS, and life-threatening opportunistic infection, if his Biktarvy is interrupted. Discontinuing or even briefly interrupting antiretroviral therapy can cause a rapid rise in HIV viral load and a fall in CD4 count and is explicitly not recommended (Gulick et al., Guidelines for the Use of Antiretroviral Agents in Adults and Adolescents With HIV, 2026; Benson et al., Guidelines for the Prevention and Treatment of Opportunistic Infections in Adults and Adolescents With HIV, 2026).

*Id.* at 14–15. Dr. Macadangdang concluded that based on her objective review of the records and his reported condition, Petitioner's hospital discharge plan is not being met, and the care he is receiving is inadequate. Further, she declared that "[t]he consequences of continued inadequate care are severe and potentially fatal."

Petitioner also provided a letter from Dr. Khrystal Audi, DDS, an Oral and Maxillofacial Surgeon, who stated that after reviewing Petitioner's medical records from May 2026 to August 18, 2026, she found several concerning details. *Id.* at 23. Petitioner has numerous teeth which are "decayed to the gumline" that are mobile and preventing him from eating. Further, Dr. Audi was concerned that a "life-threatening deep space neck infection (Ludwigs Angina)" could arise if his remaining teeth are not extracted as soon as possible. Dr. Audi states that given Petitioner's "rampant decay and several non-restorable and decayed teeth scattered throughout his oral cavity . . ., it is my professional opinion that if left

untreated, it is not a matter of if he will develop a deep space neck infection but rather when." *Id.*

Respondents do not dispute the factual allegations or evidence produced by Petitioner regarding his medical condition or the conditions at Adelanto. Respondents state that DHS detention centers provide extensive medical care as outlined in the 2025 National Detention Standards. *See* https://www.ice.gov/doclib/detention-standards/2025/nds2025.pdf. However, as Petitioner notes in reply, the national standards do not address Petitioner's medical care at Adelanto. In fact, there is a preliminary injunction currently in effect ordering the development of a remedial plan to improve medical conditions at Adelanto. *See L.T., et al. v. U.S. Immigration and Customs Enforcement (ICE), et al.,* Case No. 5:26-cv-00322-SSS-SP, Dkt. No. 104. Respondents have not rebutted Petitioner's claims and evidence regarding his medical care at Adelanto.

Respondents rely on *Pinson v. Carvajal*, 69 F.4th 1059 (9th Cir. 2023) to argue that Petitioner's claim does not sound in habeas because it is essentially challenging the conditions of his confinement. However, *Pinson* did not hold that the conditions of a detainee's confinement can never be challenged through a habeas action. *See Pinson*, 69 F.4th at 1075 ("[W]e recognize that the Supreme Court has left open the key question of whether there are circumstances when a challenge to the conditions of confinement is properly brought in a petition for writ of habeas corpus."). Instead, the *Pinson* court noted, "we need not—and do not—attempt to circumscribe the reach of habeas relief or relief on a civil rights action for federal prisoners." *Id.* at 1075, n.15. Moreover, *Pinson* involved federal prisoners serving criminal sentences, not civil detainees. A person detained under civil process "cannot be subjected to conditions that 'amount to punishment.'" *Jones v. Blanas*, 393

F.3d 918, 932 (9th Cir. 2004) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 -36 (1979)).

Here, the Court finds that based on the foregoing allegations and unrebutted evidence of Petitioner's severe medical condition, his present detention is excessive in relation to its purpose. The Court agrees with the reasoning of other cases that have addressed this issue. *See Sumano*, 2026 WL 2177112 at *4 (ordering release, finding that noncitizen detained under 8 U.S.C. § 1226(c) with high-risk pregnancy, severe mental health condition, and unrebutted evidence that her detention presented a significant risk of death (for herself and fetus), made her detention excessive in relation to its purpose, and violated due process); *Doe v. LaRose*, No. 26-cv-04552-RFL, 2026 WL 2415261 (S.D. Cal. Aug. 18, 2026) (ordering release of noncitizen in removal proceedings who had a bloody cough, blood in his urine and stool, and abdominal pain, and was regularly vomiting blood, and facing delays in treatment, based on substantive due process). Accordingly, Petitioner is likely to succeed on the merits of his substantive due process claim.

**B. Irreparable Harm**

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Where, as here, the "alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting Wright, Miller, & Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)). The Court finds that based on the likelihood of a constitutional violation and the unrebutted evidence of Petitioner's severe medical condition, Petitioner has met his burden on the second *Winter* factor.

### C. Balance of Equities and the Public Interest

Where the government is the opposing party, the third and fourth Winter factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) ("When the government is a party, the last two factors merge."). Further, a petitioner's "likelihood of success on the merits of a constitutional claim ... tips [these] merged third and fourth factors decisively in his favor." *Baird v. Bonta*, 82 F.4th 1036, 1042 (9th Cir. 2023).

Here, the government "cannot reasonably assert that it is harmed in any legally cognizable sense" by being compelled to follow the law including its own regulations. *See Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983). And an injunction is in the public interest where "a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). If any countervailing factors exist that the Court should consider in weighing the balance of the equities and the public interest, Respondents have not presented them.

Accordingly, Petitioner has met his burden in establishing the third and fourth *Winter* factors.

### D. Bond Requirement

Under Federal Rule of Civil Procedure 65(c), the Court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Despite the seemingly mandatory language, 'Rule 65(c) invests the district court with discretion as to the amount of security required, if any.' " *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (internal quotations omitted)).

Here, the Court waives the bond requirement.

Because the Court will order release based on substantive due process, it declines to address the remaining claims for the relief asserted in the TRO Application.

## III. Order

The Court GRANTS the Application for a Temporary Restraining Order and ORDERS the following:

Respondents are ordered to release Petitioner J.C.L. **no later than September 2, 2026** on terms and conditions of release that must take into account his medical and neurocognitive issues. Considering all of Petitioner's medical issues, as discussed above, Petitioner shall not be required to wear an ankle monitor. Monitoring can be accomplished through other means.

Respondents shall **SHOW CAUSE**, in writing, by **September 8, 2026**, as to why the Court should not convert the TRO into a preliminary injunction. Petitioner may file a response by **September 11, 2026.**

DATED: September 1, 2026

Patricia Donahue
United States Magistrate Judge